**Daniel FIRESTONE, Plaintiff,**

v.

**ACUSON CORPORATION LONG TERM DISABILITY PLAN, Defendant.**

**No. C 03–3894 MHP.**

United States District Court, N.D. California.

July 2, 2004.

James G. Mellen, Stonyford, CA, for Plaintiff.

Pamela E. Cogan, Ropers, Majeski, Kohn & Bentley, Redwood City, CA, for Defendant.

## MEMORANDUM & ORDER

PATEL, Chief Judge.

### Re: Defendant's Motion for Partial Summary Judgment

This action arises from defendant Acuson Corporation Long Term Disability Plan's ("Acuson") decision to terminate its payment of disability benefits to plaintiff Daniel Firestone ("Firestone") after the 24–month period set forth for mental illness-related disabilities. Plaintiff has brought suit in this court seeking to overturn defendant's decision according to the standards set forth in the Employee Retirement Income Security Act ("ERISA"). Now before the court is defendant's motion for partial summary judgment on the issue of what standard of review this court should apply when evaluating defendant's decision to terminate benefits. Having considered the arguments presented and for the reasons stated below, the court enters the following memorandum and order.

## BACKGROUND [1]

### I. Firestone's Disability Plan

On April 20, 2000, plaintiff Daniel Firestone ceased working as a purchasing manager for Acuson Corporation due to his disability or disabilities at issue in this case. As an employee of Acuson, Firestone was covered under the company's Long Term Disability Plan, issued by Liberty Life Assurance Corporation to Acuson. Gallegos Dec., Exh. A, at GBP–24. As its name may indicate, this plan provided long-term disability benefits to qualified employees. See generally id. In relevant part, the plan explained that:

---

1. Facts have been gleaned from the parties' moving papers, unless otherwise noted.

When we [Liberty] receive proof that you [a covered employee] are Disabled due to Injury or Sickness and require the regular attendance of a Physician, we will pay you a Monthly Benefit after the end of your Elimination Period. The benefit will be paid for the period of your Disability if you give to us proof of continued:

1. Disability; and
2. regular attendance of a Physician.

*Id.* at GBP–013 (capitalization in original). While the plan promised (in theory) to pay a limitless number of monthly benefits for most typical physical disabilities, it placed a specific restriction on the number of benefits that would be paid to former employees who were disabled by "Mental Illness" or "Drug and Alcohol Abuse":

The benefit for Disability due to Mental Illness and Alcohol or Drug Abuse will not exceed 24 months of Monthly Benefit payments unless you meet one of these situations.

1. You are in a Hospital or Institution for Mental Illness and Alcohol or Drug Abuse at the end of the 24 month period. The Monthly Benefit will be paid during the confinement.

. . . . .

*Id.* at GBP–016. In addition, and crucially, the plan stated that "Liberty shall possess the authority, in its sole discretion, to construe the terms of this policy and to determine benefit eligibility hereunder." McGee Dec., Exh. A, at 24.

## II. *Liberty's Evaluation of Firestone's Disability Claim*

Defendant received plaintiff's notice of disability claim on June 21, 2000. On the submitted form, plaintiff identified his psychiatrist, Dr. Frank Annis, as his treating physician, and described his disability as "Depression, sluggishness, lack of fo-cus/concentration, anxiety. Onset over a prolonged period of time becoming increasingly worse." McGee Dec., Exh. B, at CF 363. Plaintiff noted also that he had "high blood pressure, complicated by one kidney removed for cancer in 1997." *Id.* Plaintiff explained that his illness had begun as early as April 1999.

Dr. Annis, in turn, concluded that plaintiff suffered from a "Class 4" mental/nervous impairment, viz., that "patient is unable to engage in stressful situations or engage in interpersonal relations," and a "Class 3" physical impairment, viz., "slight limitation of functional capacity; capable of light work" which he believed derived from plaintiff's high blood pressure. Dr. Annis stated that plaintiff was taking various psychiatric medications "for dealing with symptoms and major life restructuring." *Id.* at CF 358–59. According to a record from a previous office visit, those psychiatric medications were Xanax and Zoloft, which plaintiff was ingesting in order to treat his anxiety and depression. *Id.* at CF 372.

On July 2, 2000, Liberty Life's case manager reviewed plaintiff's claim and recommended that Liberty Life approve the claim based upon plaintiff's mental condition. Liberty, however, decided that further investigation was warranted and spoke with plaintiff's wife on July 6, 2000; she confirmed that "Mr. Firestone is currently limited in his activities of daily living" and his "depression is only slightly improving." *Id.* at CF 013. Still not satisfied with the degree of information in their position regarding plaintiff's condition, on July 17, 2000, Liberty asked Stephanie Nelson, a Registered Nurse in Liberty's Managed Disability Services (MDS) unit to review Firestone's file. Nurse Firestone indicated that in her opinion "the [doctor's] treatment for [plaintiff] does not appear

consistent with [plaintiff's] reported symptoms." *Id.* at CF 011.

Pursuant to this opinion, Liberty then requested further notes and information from Dr. Annis on July 19, 2000. *Id.* at CF 350–53. In response to this request, Dr. Annis reported that his Axis I diagnosis was that plaintiff suffered from a "major depressive disorder," his Axis III diagnosis was of "s/p renal cancer nephrectomy," that plaintiff's Axis IV psychosocial and environment problems are "related to social environment" and "include occupational problems," and that his Axis V GAF score was 40. Dr. Annis described plaintiff's symptoms as "insomnia, constriction of interest, difficulty concentrating, alteration in affect, psycho motor agitation, psycho motor retardation, depleted energy, suicidal ideation, decreased appetite and feelings of guilt/unworthiness.." *Id.* at CF 346. Dr. Annis explained that he had prescribed Zoloft, Atenelil, Trazodone, and Ativan, and stated that he believed that plaintiff would recover fully by October 15, 2000. *Id.* at CF 344–46. Following the receipt of this information from Dr. Annis, Liberty notified plaintiff that it had approved his claim for disability benefits. *Id.* at CF 337–340. The letter of notification stated, *inter alia,* that plaintiff's claim for benefits was being approved on the grounds that he suffered from a *mental disability,* and noted that twenty-four month limit on mental illness disability payments. *Id.*

On October 5, 2000, Firestone submitted a second Disability Claim Form to Liberty, this time describing his disability as "[c]ontinuous hypertension, rapid irregular heartbeat, acid reflux discomfort, inability to swallow food, food impaction. Symptoms growing worse thru [sic] late '99 into 2000." *Id.* at CF 323. Plaintiff listed a new doctor, Seth Weissman, M.D., as his treating physician.[2] *Id.* Several weeks later, Dr. Weissman filed an "Attending Physician's Statement" ("APS") that described plaintiff as suffering from "severe GERD" (Gastrointestinal Reflux Disease) with "concurrent conditions" of "high blood pressure, history of renal cell carcinoma, and depression". *Id.* at CF 321. Dr. Weissman concluded that plaintiff suffered from a Class 5 physical impairment, as well as a Class 4 mental impairment. *Id.* at CF 322.

Presented with this new claim, Liberty requested additional records and information from Drs. Weissman and Annis. Dr. Weissman submitted paperwork indicating that plaintiff's Axis I diagnosis was "major depressive disorder ... panic disorder," his Axis III diagnosis was "stp [status post] kidney cancer," and his Axis IV diagnosis was "severe work burn out." *Id.* at CF 307. Dr. Annis's further notes confirmed this, referencing plaintiff's "Arethemia, GERD, and high blood pressure." *Id.* at 302–304. Liberty continued to request additional updated information from Drs. Weissman and Annis, and on December 29, 2000, Dr. Weissman filed another APS stating that plaintiff still suffered from a "Class 5" impairment, but one that was "due to psychiatric > [sic] physical limitations." *Id.* at CF 296. Dr. Weissman's subsequent office notes provide greater detail as to plaintiff's physical state. Dr. Weissman's notes from February 5, 2001, describe symptoms including "occasional reflux" and "episodes of arrhythmia," and conclude that "[t]he patient's blood pressure control is fair on current regimen" but that the patient will undergo further tests regarding his GERD. *Id.* at CF 183. Dr. Weissman's notes from April 9, 2001,

**2.** Dr. Weissman was apparently responsible for treating various of plaintiff's physical maladies, including the aftereffects of his treatment for cancer of the kidneys.

state that plaintiff's GERD was "under pretty good control" but explain also that "[t]he patient's blood pressure is not optimal" and describe periods of dizziness. *Id.* at CF 185–86. Finally, Dr. Weissman's June 1, 2001, office notes, following a subsequent examination of plaintiff, state that plaintiff's heartbeat has a "[r]egular rate and rhythm without murmur" and describe his blood pressure as "much better controlled on his current regimen," but explain also that "the patient's [GERD] symptoms have returned." *Id.* at CF 187.[3]

Over the following months, Liberty continued to request more information regarding plaintiff's condition, and plaintiff's doctors continued to submit additional notes and reports that described his changing status and shed more light on his evolving health. On August 20, 2001, Liberty received a "Physical Capabilities Form" from Dr. Weissman that opined that plaintiff would not be able to work a full eight-hour workday.[4] *Id.* at CF 166–67. When asked for the reason for his opinion, however, Dr. Weissman explained that *"severe depression* limits Mr. Firestone at the current time." *Id.* at CF 167 (emphasis added). On February 20, 2002, Dr. Annis sent to Liberty a new "Func-

tional Mental Status Evaluation" in which he stated, in response to the Liberty's query regarding the manner in which plaintiff's symptoms interfere with his ability to work, that plaintiff "is mostly disabled by his *physical condition.*"[5] *Id.* at CF 149 (emphasis added).

In contradictory fashion, Dr. Weissman sent a note to Liberty on March, 7, 2002, stating that Firestone was "primarily disabled due to psychiatric condition." *Id.* at CF 142. Dr. Weissman supplemented these notes with a "Physical Capacities Form" on which he wrote that restrictions on plaintiff's physical abilities and capacities were "based mostly on patient's subjective complaints, overall fatigue and weakness." *Id.* at CF 144. The form also described Dr. Weissman's diagnosis of plaintiff as including depression, high blood pressure, and GERD. *Id.* However, in May of that year, on another Functional Capabilities Form, Dr. Weissman submitted to Liberty a somewhat different formulation of his diagnosis of plaintiff's condition, explaining that Firestone's restrictions on activity were due to his "severe depression which greatly limits his overall physical activity." *Id.* at CF 69.

---

3. Defendant places a great deal of emphasis upon the fact that information received from Dr. Annis at approximately this same time states that plaintiff was unable to "function in a work setting" because he "can't focus, concentrate, produce," the implication being that these are mental, rather than physical, factors. *Id.* at CF 209. That Dr. Annis here referred to plaintiff's mental difficulties, rather than any physical ones, is hardly a surprise; Dr. Annis is plaintiff's *psychiatrist,* and the form he submitted is titled "Functional Mental Status Evaluation." *Id.* at CF 208. The court will not infer negative implications regarding plaintiff's physical condition from documents that purport to discuss only his mental condition, and defendant is admonished not to proffer such (intentionally or unintentionally) misleading quotations in the future.

4. The form does not indicate the date upon which Dr. Weissman prepared it.

5. For the same reason that the court was unsurprised when Dr. Annis previously did not name plaintiff's physical maladies as the reason that plaintiff could not function in a work setting, the court is now puzzled as to why Dr. Annis opined—on a form that asks for an evaluation of plaintiff's mental status— regarding plaintiff's physical condition, an area that is presumably outside of the range of treatment that he has been providing to plaintiff. Moreover, Dr. Annis previously indicated on the same form that plaintiff's work readiness was "not being measured by me." *Id.* at CF 148.

Dr. Weissman also listed hypertension, GERD, and renal cell carcinoma among plaintiff's "concurrent conditions." *Id.* Regardless of the cause of plaintiff's condition, Dr. Weissman's description of it painted a stark, pessimistic picture; Weissman stated that Firestone was unable to squat, climb, drive, or lift more than ten pounds, could only stand and walk for approximately one third of an average (eight hour) work day, and could only sit for approximately one to two thirds of a work day. *Id.*

Having accumulated this information, Liberty forwarded plaintiff's medical file to Katherine Patrick, a registered nurse, on June 4, 2002. After reviewing the file, Ms. Patrick concluded that plaintiff was not suffering from a physical disability that restricted his ability to work, and thus that Liberty should subject plaintiff's benefits to the 24–month limitation imposed on mental disability payments. *See id.* at CF 72. Accordingly, on June 7, 2002, Liberty notified plaintiff that because it did not believe that he met the conditions for a "physical disability" under the terms of his insurance plan, his benefits would be terminated on July 19, 2002, twenty-four months after they had begun. *See id.* at CF 64–66. According to Liberty, "[t]he medical evidence shows that your mental condition restricts your physical activities and is the disabling condition." *Id.* at CF 65.

Plaintiff appealed Liberty's decision on August 2, 2002, and with the appeal submitted letters from Drs. Annis and Weissman discussing plaintiff's current health. Dr. Annis's letter traced Firestone's mental problems, in part, to his physical ailments, explaining that "the combination of physical problems (cardiac arrhythmia and

severe GERD) and a word-commute car accident (in November 199[sic]) had resulted in a severe depression episode and panic attacks with agoraphobia." *Id.* at CF 61. Dr. Weissman's letter described Firestone's condition in somewhat greater detail, describing the seven conditions on Firestone's "problem list": hypertension, GERD, a history of renal cell carcinoma, diverticulitis, gout, obstructive sleep apnea, and depression. *Id.* at CF 58–59. Dr. Weissman noted that plaintiff was able to control his hypertension with medication, but explained that that medication could potentially cause him fatigue. *Id.* at CF 58. Dr. Weissman also stated that plaintiff's GERD had "been controlled," although he had suffered "two episodes of acute food impaction requiring hospitalization" and might eventually need surgery. *Id.* In sum, Dr. Weissman concluded that Firestone's "symptoms are severe enough to prevent him from returning to work in the capacity of his usual and customary employment." *Id.* at CF 59.

In the course of reviewing plaintiff's appeal of its adverse decision, Liberty sent Firestone's file to a consulting physician, Dr. Steven Miszkiewicz, M.D., for his review.[6] On October 4, 2002, Dr. Miszkiewicz filed a memorandum with Liberty in which he concluded that plaintiff was depressed but that plaintiff's physical ailments, "alone or together offer documentation to impair [Firestone] from a return to work." *Id.* at CF 20. By consequence, Liberty notified plaintiff on October 15, 2002, that it had affirmed its original decision to cap plaintiff's disability benefits at twenty-four months of payments. On August 22, 2003, plaintiff filed suit in this court, seeking reversal of Liberty's decision to terminate his benefits. Now before

**6.** Neither Dr. Miszkiewicz, nor any other Liberty employee, ever examined plaintiff in person.

this court is defendant's motion for partial summary judgment on the sole issue of what standard of review this court must apply when evaluating defendant's decision to terminate plaintiff's benefits.

## LEGAL STANDARD

### I. Summary Judgment

Summary judgment is proper when the pleadings, discovery and affidavits show that there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Material facts are those which may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Id.* The moving party for summary judgment bears the burden of identifying those portions of the pleadings, discovery and affidavits that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). On an issue for which the opposing party will have the burden of proof at trial, the moving party need only point out "that there is an absence of evidence to support the nonmoving party's case." *Id.*

Once the moving party meets its initial burden, the nonmoving party must go beyond the pleadings and, by its own affidavits or discovery, "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). Mere allegations or denials do not defeat a moving party's allegations. *Id.; see also Gasaway v. Northwestern Mut. Life Ins. Co.*, 26 F.3d 957, 960 (9th Cir.1994). The court may not make credibility determinations, *Anderson*, 477 U.S. at 249, 106 S.Ct. 2505, and inferences to be drawn from the facts must be viewed in the light most favorable

to the party opposing the motion. *Masson v. New Yorker Magazine*, 501 U.S. 496, 520, 111 S.Ct. 2419, 115 L.Ed.2d 447 (1991).

### II. Judicial Review of ERISA Disability Claims

 The disability insurance plan at issue in this case is a defined benefit plan subject to the provisions of the Employment Retirement Income Security Act ("ERISA"). 29 U.S.C. §§ 1001 *et seq.* A denial of ERISA benefits is reviewed de novo unless "the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility benefits or construe the terms of the plan." *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). Under *Firestone*, the default presumption is that the administrator has no discretion and must show that the plan confers discretionary authority. *Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1089 (9th Cir.1999) (en banc). If the benefit plan confers discretion on the administrator, a reviewing court must apply an abuse of discretion standard. *See Bendixen v. Standard Ins. Co.*, 185 F.3d 939, 942 (9th Cir.1999); *McClure v. Life Ins. Co. of North America*, 84 F.3d 1129, 1132 (9th Cir.1996).

 Under the abuse of discretion standard, the court's review is limited to the administrative record, and the decision of an administrator will not be disturbed unless the court determines that the decision was arbitrary or capricious. *See McKenzie v. Gen. Tel. Co. of Cal.*, 41 F.3d 1310, 1316 (9th Cir.1994); *Clark v. Wash. Teamsters Welfare Trust*, 8 F.3d 1429, 1431 (9th Cir.1993). "The touchstone of arbitrary and capricious conduct is unreasonableness." *Id.* at 1432. In contrast, under the de novo standard, the normal summary judgment standard applies, and

the district court may grant summary judgment if there are no genuine issues of material fact in dispute. *Tremain v. Bell Ind.,* 196 F.3d 970, 978 (9th Cir.1999).

## DISCUSSION

Liberty's disability policy unambiguously confers discretionary authority upon the insurance company to make decisions regarding plan coverage and benefits. *See* Gallegos Dec., Exh. A, at GBP–021; McGee Dec., Exh. A, at 24. In the absence of further evidence or argument, defendant's motion for partial summary judgment would be granted and this court would review defendant's plan decisions only for an abuse of discretion. However, plaintiff has proposed three grounds according to which this court might deny defendant's motion for partial summary judgment and find that it must review defendant's termination of plan benefits *de novo.* Those grounds are considered seriatim below.

### I. *Contradictory Language*

■ ERISA requires that a provider of any employee benefit plan file a "summary plan description" (SPD) and furnish a copy to each beneficiary. 29 U.S.C. § 1022(a). Plaintiff asserts that, unlike the group insurance policy itself, the SPD does not contain language vesting discretion to make determinations under the plan with Liberty. *See* Pl. Opp., at 10 ("A perusal of that document shows that no such discretion granting language appears there."). Plaintiff argues that conflicts between the

SPD and the group insurance policy must be resolved in favor of the beneficiary, and thus that the absence of such language in the SPD requires that this court adopt a *de novo* standard of review. *See Bergt v. Retirement Plan for Pilots Employed by MarkAir, Inc.,* 293 F.3d 1139 (9th Cir. 2002).

Plaintiff would apparently have benefited from *reading* the SPD (or defendant's moving papers), rather than merely perusing it. Essentially mirroring the language of the plan description, the SPD states that "[w]e shall possess the authority, in our sole discretion, to construe the terms of this plan and to determine benefit eligibility hereunder. Our decisions regarding construction of the terms of this plan and benefit eligibility shall be conclusive and binding." [7] Gallegos Dec., Exh. A, at GBP–021. No contradiction exists between these provisions, and thus there exists no conflict that this court need resolve.

### II. *Illegality of "Discretion" Clauses in California*

■ On February 26, 2004, in an opinion letter to a plaintiff in a similar action before this court,[8] the State of California's Department of Insurance (DOI) explained that it had taken the position that "discretionary clauses" which "purport to confer on the insurer discretionary authority to determine eligibility for benefits" render the insurance contracts containing them "fraudulent or unsound," and therefore unlawful, under California Insurance Code

---

7. The court does not know whether plaintiff was led to advance this argument simply through sheer ignorance and neglect, or whether plaintiff intended to attempt to deceive the court in the face of such unambiguously congruent language. Regardless, plaintiff is cautioned to avoid such misadventures in the future.

8. The case that gave rise to this letter is *Rowe v. Planetout Partners and Unum Life Insurance Company,* No. C 03–1145 WHA. That case is currently pending before Judge William Alsup. Defendant has moved to strike the documents contained in plaintiff's request for judicial notice. As the disposition of defendant's motion will make clear, the court need not consider this request.

§ 10291.5(b)(1).[9] Letter opinion per CIC § 12921.9: Discretionary Clauses, at 1. The next day, the Department of Insurance issued a notice that it intended to withdraw approval of a plethora of benefit plans—issued by several different insurance companies—that contained such language. Notice to Withdraw Approval and Order for Information, at 1; Cal. Ins.Code § 10291.5(f). Liberty was not among the companies identified in that notice as subject to plan disapproval. *See* Notice to Withdraw Approval and Order for Information, at 2. Citing *Skidmore v. Swift and Co.*, 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124 (1944), plaintiff argues that the DOI letter constitutes persuasive authority as to the state of California law, and thus that under California law this court must invalidate the portion of Firestone's policy granting discretionary authority to defendant.

Even if plaintiff (and the DOI's) interpretation of section 10291.5(b)(1) were correct, and assuming that section 10291.5(b)(1) is not preempted by ERISA,[10] this court nevertheless remains incapable of granting plaintiff the relief he seeks or denying defendant's motion for summary judgment on this ground. Section 10291.5(b) sets forth the parameters within which the California Commissioner of Insurance may, in the exercise of her discretion, approve or disapprove insurance policies. *See generally* Cal. Ins.Code § 10291.5(b). This section also grants the Commissioner authority to withdraw her approval of a plan that she no longer believes meets the strictures set forth in section 10291.5(b). Cal. Ins.Code § 10291.5(f); 10 Cal.Code Regs. 2196.4. An insured who believes that the Commissioner has abused her discretion by approving a plan that does not meet the requirements of section 10291.5(b) may petition a court for a writ of mandamus requiring that the Commissioner rescind her approval of the plan. *See generally Bixby v. Pierno*, 4 Cal.3d 130, 93 Cal.Rptr. 234, 481 P.2d 242 (1971); Cal.Code Civ. Proc. § 1094.5.

▆▆▆ Yet section 10291.5 does not confer upon beneficiaries such as Firestone the right to "reform the nature of his policy and obtain benefits for which he never bargained by engaging courts to second-guess the Commissioner's approval of the policy." *Peterson v. American Life and Health Ins. Co.*, 48 F.3d 404, 410 (9th Cir.), *cert. denied*, 516 U.S. 942, 116 S.Ct. 377, 133 L.Ed.2d 301 (1995). Once the Commissioner has approved a plan, "an otherwise valid policy is a binding contract and governs the obligations of the parties until the Commissioner revokes his approval."[11] *Id.* Plaintiff's only potential remedy is a writ of mandamus compelling

---

9. The full text of this subsection reads:

> (b) The commissioner shall not approve any disability policy for insurance or delivery in this state in any of the following circumstances:
>
> (1) If the commissioner finds that it contains any provision, or has any label, description of its contents, title, heading, backing, or other indication of its provisions which is unintelligible, uncertain, ambiguous, or abstruse, or likely to mislead a person to whom the policy is offered, delivered or issued.

Cal. Ins.Code § 10291.5(b)(1).

10. For the reasons described *infra*, the court need not address either of these questions.

11. At various points in his briefing papers, plaintiff calls into question the issue of whether the policy issued by Liberty is indeed valid and was in fact approved by the Commissioner of Insurance. That issue is not genuinely a subject of defendant's motion and is not properly before this court. Plaintiff is obviously entitled to raise this question at a later point if there exist facts to support the contention that the plan itself is invalid for lack of approval or improper filing.

the Commissioner to withdraw her approval; section 10291.5 does not enable plaintiff "to maintain a private action against [Liberty] to rewrite the terms of his policy." *Id.* at 411. Section 10291.5 simply does not empower this court to declare a certain portion of plaintiff's policy invalid or to unilaterally reform the terms and conditions of that policy. *Id.* at 410–11.

Moreover, even if plaintiff were to succeed in persuading this court to issue a writ of mandamus forcing the Commissioner to revoke acceptance of the Liberty policy, such a revocation operates only "prospectively and not retrospectively." Cal. Ins.Code § 10291.5(f). Because the DOI has not yet even indicated its intention to consider revoking acceptance of Liberty's plan, it is certainly premature to consider at this stage what effect such a "prospective" revocation might have upon this case. *See* Notice to Withdraw Approval and Order for Information, at 2. It is necessary only to note that the DOI's opinion letter does not serve as a basis for defeating defendant's motion for partial summary judgment or subjecting defendant's termination decision to *de novo* review.[12]

## III. *Conflict of Interest*

■■■■■ Although a provision vesting discretionary authority with the administrator of a benefits plan will typically be evaluated according to an "abuse of discretion" standard, "if a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a factor in determining whether there is an abuse of discretion." *Firestone,* 489 U.S. at 115, 109 S.Ct. 948. When such a conflict of interest exists, the court's review, "although still for abuse of discretion, is 'less deferential.'" *Tremain v. Bell Indus., Inc.,* 196 F.3d 970, 976 (9th Cir.1999) (citing *Lang v. Long–Term Disability Plan of Sponsor Applied Remote Technology, Inc.,* 125 F.3d 794, 798 (9th Cir.1997)). In the Ninth Circuit, however, if a party such as Firestone wishes to invoke actual *de novo* review, it is not sufficient that the party demonstrate merely that the plan administrator "has a conflict of interest by virtue of its economic stake in the benefit decisions it makes."[13] *Atwood v. Newmont Gold Co., Inc.,* 45 F.3d 1317, 1322 (9th Cir.1995). Rather, the "affected beneficiary" must come forward "with further evidence indicating that the conflicting interest *caused a breach of the administrator's fiduciary duty* to the beneficiary." *Id.* at 1323 (emphasis added); *see also Barnett v. Kaiser Found. Health Plan, Inc.,* 32 F.3d 413, 416 (9th Cir.1994) (refusing to apply "heightened review" in the absence of a showing that there existed a "serious conflict").

■■■■■ Production by the affected beneficiary of "material, probative evidence, beyond the mere fact of the appar-

---

**12.** At oral argument, plaintiff's counsel suggested that the particular portions of the disability plan granting discretionary authority to defendant had never been submitted to—or approved by—the Department of Insurance. Upon further investigation, plaintiff's counsel determined that this crucial form had in fact been approved by the DOI. *See* Mellen Dec., at 5. The court hopes that this experience will serve as yet another cautionary reminder to plaintiff's counsel to conduct the necessary investigation *before* raising an argument, much less raising it initially at oral argument. The court will not be so indulgent of plaintiff's counsel's misadventures in the future.

**13.** The Ninth Circuit has termed this type of financial self-interest—in which the same entity serves as both the source of funding and the administrator of a plan—an "apparent conflict of interest." *Nord v. Black & Decker Disability Plan,* 356 F.3d 1008, 1010 (9th Cir. 2004).

ent conflict, tending to show that the fiduciary's self-interest caused a breach of the administrator's fiduciary obligations" gives rise to a rebuttable presumption that the conflict of interest influenced the administrator's decision. *Atwood*, 45 F.3d at 1323; *Tremain*, 196 F.3d at 976. Subsequent to such a showing by the affected beneficiary, the plan administrator "bears the burden of producing evidence to show that the conflict of interest did not affect the decision to deny benefits." *Atwood*, 45 F.3d at 1323. In the event that the plan administrator cannot rebut the showing that it has breached its fiduciary duty, the court must review the administrator's decision *de novo*, "without deference to the administrator's tainted exercise of discretion." *Id.* Here, Liberty admits a conflict of interest exists because it "both funds and administers claims for the Plan." Def. Mot., at 22. The question before the court is thus whether Liberty has breached its fiduciary duty to Firestone.

The Ninth Circuit has never explicitly defined the parameters or contours of what might suffice to constitute a breach of fiduciary duty in this context. However, when evaluating the possibility of such a breach, that court has appeared to focus upon procedural irregularities or structural inconsistencies within the plan administrator's decision-making process, rather than the substantive accuracy of the administrator's decision-making.[14] Although it did not claim to be offering an exclusive list of possibilities, the Ninth Circuit has stated that "material, probative evidence [of a breach of fiduciary duty] may consist of inconsistencies in the plan administrator's reasons, insufficiency of those reasons, or procedural irregularities in the processing of the beneficiaries' claims." *Nord v. Black & Decker Disability Plan*, 356 F.3d 1008, 1010 (9th Cir.2004) (internal quotation marks and citation omitted); *see also Lang*, 125 F.3d at 799 (insurance company assumed inconsistent positions regarding showing beneficiary must make in order to qualify for benefits); *Tremain*, 196 F.3d at 977 (insurance company applied varying and inconsistent definitions of disability and failed to justify its determination); *Friedrich v. Intel Corp.*, 181 F.3d 1105, 1110 (9th Cir.1999) (plan administrator "failed to follow its internal procedure;" "provided Friedrich with insufficient notice of the denial of his claim, an unfair review procedure and inadequate dialogue regarding his claim;" "administered Friedrich's claim as an adversary;" and "failed to provide a 'full and fair' appeals procedure").

The record before the court is devoid of any indicia of such procedural irregularities or structural discrepancies, and plaintiffs have not asserted that such exist. *See* Pl. Opp., at 12. Liberty has taken a consistent view towards Firestone's disability claims, maintaining throughout the pendancy of his disability and benefits review that they accepted his claim based on the fact of his mental disability and never indi-

---

14. Indeed, to address the substance of—and evidentiary support for—Liberty's decision at this stage would be to effectively place the proverbial cart squarely before the (proverbial) horse. The court would be placed in the rather paradoxical position of examining the facts surrounding the denial of benefits—and therefore the merits of the case—in order to determine the standard according to which it should review the merits of the case. The court is not certain whether plaintiff under- stood this distinction, as plaintiff's principal citation on this issue is to a case in which the plan beneficiary proffered no evidence to establish that the insurance company had breached its fiduciary duty. *See Zavora v. Paul Revere Ins. Co.*, 145 F.3d 1118, 1122 (9th Cir.1998). The court therefore reviewed the insurance company's decision according to the *abuse of discretion standard* and overturned it under those auspices. *See id.* at 1123.

cating acquiescence to his request for benefits due to physical disability. McGee Dec., Exh. B, at CF 337–340. The administrative record indicates that plaintiff was provided a full opportunity to submit materials in support of his claim. *See generally id.* Before terminating plaintiff's claim, Liberty submitted the medical record to a consulting physician, Dr. Miszkiewicz, for consideration; contrary to Firestone's assertions, Dr. Miszkiewicz's recommendations to Liberty are buttressed by a modicum of analysis. *See id.* at CF 20–21. That Liberty chose to credit Dr. Miszkiewicz's conclusions regarding the available medical information over those of Firestone's treating physicians is not, by itself, a legally adequate basis upon which this court may conclude that Liberty breached its fiduciary duty to Firestone. *See Black & Decker Disability Plan v. Nord,* 538 U.S. 822, 123 S.Ct. 1965, 155 L.Ed.2d 1034 (2003). Plaintiff has not put forth material, probative evidence demonstrating that defendant breached its fiduciary duty and allowed its conflict of interest to influence its decision regarding Firestone's benefits.

*CONCLUSION*

For the reasons stated above, defendant's motion for partial summary judgment is GRANTED. Defendant's decision to terminate plaintiff's benefits will be reviewed only for abuse of discretion.

IT IS SO ORDERED.