**Lorene LUNDQUIST, Plaintiff,**

v.

**CONTINENTAL CASUALTY COMPANY, et al.,
Defendants.**

**No. CV 02–9602FMO.**

United States District Court,
C.D. California.

Sept. 30, 2005.

Glenn R. Kantor, Gruber & Kantor, Sherman Oaks, CA, for Plaintiff.

Robert F. Keehn, Galton & Helm, Los Angeles, CA, for Defendants.

## ORDER REVERSING ADMINISTRATIVE DETERMINATION RE: ERISA BENEFITS

OLGUIN, United States Magistrate Judge.

### INTRODUCTION

This is a claim for the recovery of benefits under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et seq.* For the reasons set forth below, the administrative decision to terminate benefits is reversed.

### PROCEEDINGS

On December 17, 2002, plaintiff Lorene Lundquist ("plaintiff" or "Lundquist") commenced this action by filing a "Complaint For Breach Of Employee Retirement Income Security Act Of 1974" ("Complaint"), asserting that her disability benefits were improperly terminated in violation of ERISA. In her Complaint, plaintiff named as defendants Continental Casualty Company ("CNA") and Blue Cross of California Disability Plan.[1] Plaintiff requests the following relief: (1) a declaration that she is disabled under the terms of the relevant disability plan and entitled to continued disability benefits; (2) payment of disability benefits due, including all prejudgment and postjudgment interest, from the date her benefits were terminated; (3) attorney fees and costs pursuant to 29 U.S.C. § 1132(g)(1); and

---

1. Although not addressed by any of the parties, it appears that plaintiff inadvertently named Blue Cross of California Disability Plan as a defendant in her Complaint rather than WellPoint Health Networks Group Short Term Disability Plan ("WellPoint STD Plan"). Such inadvertence, however, does not appear to be substantial or material. Indeed, in her Complaint, plaintiff correctly referred to Policy No. SR–83094619, the policy number for the WellPoint STD Plan. (Complaint at 2). Also, plaintiff's Proof of Service of Summons and Complaint reflects that plaintiff served her summons and Complaint on WellPoint Health Networks, Inc. rather than Blue Cross of California. In addition, plaintiff, throughout her pleadings, interchangeably used both entities, Blue Cross of California Disability Plan and WellPoint STD Plan. Furthermore, CNA and Wellpoint STD Plan, not Blue Cross of California Disability Plan, filed an Answer to plaintiff's Complaint, and all pleadings filed by defendants have named CNA and WellPoint STD Plan as the sole defendants in this action. Finally, WellPoint STD Plan, not Blue Cross of California Disability Plan, is named in the relevant plan documents submitted as part of the Administrative Record. Accordingly, the court will refer to CNA and WellPoint STD Plan as the proper defendants in its decision. *See Everhart v. Allmerica Financial Life Ins. Co.,* 275 F.3d 751, 754 (9th Cir.2001), *cert. denied,* 536 U.S. 958, 122 S.Ct. 2662, 153 L.Ed.2d 836 (2002) (in an ERISA action to recover benefits, the plan is a proper defendant); *Gaines v. Sargent Fletcher, Inc. Group Life Ins. Plan,* 329 F.Supp.2d 1198, 1210–11 (C.D.Cal.2004) (insurance company that carried out actual administration of claims was proper defendant in ERISA action for recovery of benefits); 29 U.S.C. § 1132(d) (an employee benefit plan may be sued under ERISA as an entity).

(4) any further relief the court deems just and proper.

CNA and WellPoint STD Plan (collectively "defendants") filed their Answer to plaintiff's Complaint ("Answer") on February 12, 2003. In their Answer, defendants denied plaintiff's allegations regarding disability and raised two affirmative defenses, specifically that plaintiff's Complaint fails to state a claim upon which relief may be granted and that plaintiff's alleged injuries, if any, were proximately caused, wholly or in part, by the acts, omissions, negligence, neglect or wrongful acts of parties, persons, entities or corporations other than defendants.

On May 13, 2003, the parties consented to proceed before the undersigned United States Magistrate Judge. Subsequently, on September 17, 2003, the parties stipulated that "the case will be decided by the court based upon the administrative record, which is less than 200 pages, and any supplementation of the record the court deems permissible." (Court's Stipulation and Order Allowing Waiver of Settlement Conference and Setting Briefing Schedule for Trial, filed September 17, 2003, at 2).

Plaintiff filed her "Trial Brief" ("Plaintiff's Trial Brief") on October 23, 2003, and defendants filed their "Opening Trial Brief" ("Defendants' Trial Brief") on October 24, 2003. Thereafter, on November 6, 2003, plaintiff filed a "Response to Defendants' Trial Brief" ("Plaintiff's Response Brief"), and on November 7, 2003, defendants filed a "Responsive Trial Brief" ("Defendants' Response Brief").

On November 18, 2003, the court heard oral arguments from plaintiff and defendants, after which the matter was deemed submitted. (See Court's Minute Order of November 18, 2003).

On March 3, 2004, plaintiff filed a document entitled "Supplemental Authority Re Standard of Review Following Trial" ("Plaintiff's Supplemental Authority"), in which plaintiff requested that the court take judicial notice of an opinion letter and notice issued by the California Department of Insurance ("California DOI"), on February 26 and 27, 2004, respectively, withdrawing approval of disability insurance policies containing discretionary clauses. In response to Plaintiff's Supplemental Authority, the court ordered additional briefing from the parties. (See Court's Order of March 5, 2004, at 1–2).

On March 25, 2004, plaintiff filed her "Supplemental Brief Following Trial" ("Plaintiff's Supplemental Brief"), and on June 16, 2004, defendants filed their "Post–Trial Supplemental Brief" ("Defendants' Supplemental Brief"). Shortly thereafter, on July 16, 2004, plaintiff filed a "Reply Brief In Support of Supplemental Brief Following Trial" ("Plaintiff's Supplemental Reply Brief").

The parties filed various requests for judicial notice from July 16, 2004, through March 31, 2005, relating to the California DOI's revocation of its approval of discretionary clauses in disability insurance policies.

### SUMMARY OF FACTS

### I. PLAINTIFF'S EMPLOYMENT.

Plaintiff is a 66–year–old woman who began employment with Blue Cross of California ("Blue Cross") on April 14, 1997. (Administrative Record for ERISA Trial ("AR") at 2, 16 & 20). Plaintiff's last day of employment with Blue Cross was on December 7, 2001. (Id. at 19–20, 31, 40, 52, 61, 64, 70, 73 & 125).

During her employment with Blue Cross, plaintiff worked as a Clinical Research Manager in the Grievance and Appeals Department, a department that handles approximately 700 appeals and complaints per month. (AR at 2, 16, 19–20, 22, 28, 31, 40, 59, 61, 64, 67 & 70). In

this management position, plaintiff earned an annual salary of approximately $72,185.00 to $75,073.00. (*Id.* at 16 & 20). Her duties included: data entry; reviewing medical records; handling a case load of approximately 135 cases, each of which had to be closed within 30 days; handling expedited appeals, each of which had to be closed within three days; training new employees; and attending three to five employee management meetings a week, which lasted anywhere from one to four hours. (*Id.* at 16, 20, 22 & 70).

Plaintiff described her job as stressful due, in part, to a decrease in department size and a hiring freeze that was in place in 2001 and 2002. (AR at 24, 28 & 70). In a letter to defendant CNA, dated April 12, 2002, plaintiff stated:

> Since I am one of the managers in [the Grievance and Appeals] department, I have a twofold job. Over the last 18 months the department has decreased in size and all the employees, especially the managers, have assumed an increase in the work load. I added to my work load of trainer of all new hires with a small case load, to a large case load of 135 cases, plus continued as a resource manager to all the employees. These cases have to be reviewed, records requested, re-reviewed and presented to a Medical Director, and closed with a decision within 30 days. There are also expedited appeals that have to be handled and closed within 3 days. This was added on to the 135 cases already being reviewed.
>
> Since I am in management I also attend 3–5 meetings per week, that last anywhere from 1–4 hours. As you can see this is much more than data entry

and record review. With changes in the management of the department and a hiring freeze in the last year, the department became very stressful. The case load was 3 times what it was when I hired on with the company.

(*Id.* at 70).

## II. THE PLANS.

Defendant CNA issued group insurance contracts providing short term and long term disability benefits to WellPoint Health Networks, Inc. ("WellPoint"). (AR at 132–61 & 162–97). WellPoint, in turn, used the contracts to establish its Group Short Term Disability Plan ("WellPoint STD Plan"), Policy No. SR–83094619, and Group Long Term Disability Plan, ("WellPoint LTD Plan"), Policy No. SR–83094620, (collectively the "Plans"), which are employee welfare benefit plans funded by CNA and governed by ERISA. (*Id.*).

The Plans were offered to eligible employees of WellPoint and its subsidiaries, including Blue Cross. (AR at 139 & 165). Plaintiff, as an employee of Blue Cross, was eligible for, and was covered by both the WellPoint STD and LTD Plans. (*Id.* at 16, 20, 139 & 165).

Pursuant to the Plans, both WellPoint and CNA had "discretionary authority" to "interpret the terms of the Plan[s] and to determine eligibility for and entitlement to benefits in accordance with the Plan[s]." (AR at 158 & 193; *see also id.* at 147 & 179). As such, WellPoint and CNA acted as plan fiduciaries under the Plans. (*Id.* at 147, 158, 179 & 193; *see also* 29 U.S.C. § 1002(21)(A).[2] Although only WellPoint was named plan administrator under the

---

**2.** Pursuant to 29 U.S.C. § 1002(21)(A), "a person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan."

Plans, (AR at 158 & 193), CNA, in fact, actively participated in the administration of the Plans. Indeed, as set forth in further detail below, it was exclusively CNA that denied plaintiff's claim for benefits, a decision that led to the filing of the Complaint in the instant action. *See Gaines*, 329 F.Supp.2d at 1211 (insurer was not expressly named as plan administrator in the plan, but "participated in the administration of the plan, having undertaken the sole responsibility for administering claims" and "specifically rejected the claim in this case").

### A.  The WellPoint STD Plan.

Under the WellPoint STD Plan, "disability" is defined as:

> *Injury* or *Sickness* [that] causes physical or mental impairment to such a degree of severity that *You* are:
>
> 1.  continuously unable to perform the *Material and Substantial Duties* [3] of *Your Regular Occupation* [4]; and
>
> 2.  not working for wages in any occupation for which *You* are or become

qualified by education, training or experience.

(AR at 149) (italics in original).[5]

If an employee establishes "disability," the WellPoint STD Plan provides short term disability benefits for a maximum period of 26 weeks, subject to a waiting or "elimination" period [6] of seven days for disability based upon sickness, but no waiting or "elimination" period for disability based upon injury.[7]  (AR at 143–44 & 149). The seven-day elimination period based upon sickness, rather than injury, is applicable in this case.  (*Id.* at 16 & 20).

Under the WellPoint STD Plan, the weekly benefit is calculated based upon the type of plan in which the employee is enrolled, Plan A, B, or C. (AR at 143). Here, plaintiff was covered under Plan C of the WellPoint STD Plan, (*id.* at 4, 11, 13, 16, 20 & 52 & Plaintiff's Trial Brief at 11), which means that her weekly benefit is calculated as:

> 70% of *Weekly Earnings* to a maximum benefit of $1,500.00 per Week subject to reduction by deductible sources of income or *Disability Earnings* \*.  \*In no event will the Weekly Benefit, after the

---

**3.**  "Material and Substantial Duties" are defined under the WellPoint STD Plan as "the necessary functions of *Your Regular Occupation* which cannot be reasonably omitted or altered."  (AR at 156) (italics in original).

**4.**  "Regular Occupation" is defined under the WellPoint STD Plan as "the occupation that *You* are performing for income or wages on *Your Date of Disability*. It is not limited to the specific position *You* held with *Your* employer."  (AR at 157) (italics in original).

**5.**  This definition of disability is based upon the "Occupation Qualifier."  (AR at 149). "Disability" under the WellPoint STD Plan, in fact, can be met by satisfying either the "Occupation Qualifier" or the "Earnings Qualifier."  (*Id.*).  However, because both parties concede that plaintiff's claim arises under the "Occupation Qualifier," there is no need to

discuss or set forth the "Earnings Qualifier" definition here.  (*See* Plaintiff's Trial Brief at 11 & Defendants' Trial Brief at 3 n. 1).

**6.**  The WellPoint STD Plan defines "elimination period" as "the number of calendar days at the beginning of a continuous period of *Disability* for which no benefits are payable." (AR at 156) (italics in original).  It begins on the day an employee becomes disabled.  (*Id.* at 149).

**7.**  "[I]njury" is defined as "bodily injury caused by an accident which results, directly and independently of all other causes, in *Disability* which begins while *Your* coverage is in force."  (AR at 156) (italics in original). "Sickness" is defined as "sickness or disease causing *Disability* which begins while *Your* coverage is in force."  (*Id.* at 157) (italics in original).

reductions stated in [the] Deductible Sources of Income provision, be less than $25.00 per week.

(AR at 143) (italics in original).

### B. The WellPoint LTD Plan.

Under the WellPoint LTD Plan, the definition of "disability" is based upon the type of plan in which the employee is enrolled, Plan A, B, C, D or E. (AR at 181–82). In the instant case, plaintiff was covered under Plan C. (*Id.* at 16 & 20 & Plaintiff's Trial Brief at 11). Under Plan C, "disability" is defined in the same manner as under the WellPoint STD Plan for the first 24 months during which benefits are payable. (AR at 181). Specifically: "*Disability*" means that during the *Elimination Period*[8] and the following 24 months, *Injury* or *Sickness* causes physical or mental impairment to such a degree of severity that *You* are:

1. continuously unable to perform the *Material and Substantial Duties*[9] of *Your Regular Occupation*[10]; and

2. not working for wages in any occupation for which *You* are or become qualified by education, training or experience.

(*Id.*) (italics in original).

Thereafter, the definition of "disability" is defined as follows:

After the *Monthly Benefit* has been payable for 24 months, "*Disability*" means that *Injury or Sickness* causes physical or mental impairment to such a degree of severity that *You* are:

1. continuously unable to engage in any occupation for which *You* are or become qualified by education, training or experience; and

2. not working for wages in any occupation for which *You* are or become qualified by education, training or experience.

(AR at 181) (italics in original).

Accordingly, if an employee can establish "disability" under the definitions set forth above, the WellPoint LTD Plan provides long term disability benefits for a period of 24 months and a determinate period thereafter,[11] as long as the employee is "continuously unable to engage in any occupation for which [the employee] [is] or become[s] qualified by education, training or experience" and "not working for wages in any occupation for which [the employee] [is] or become[s] qualified by education, training or experience." (AR at 181) (italics in original).

Under Plan C of the WellPoint LTD Plan, the monthly benefit is calculated as follows:

This definition is identical to that found in the WellPoint STD Plan. (*Id.* at 156).

---

**8.** The WellPoint LTD Plan, like the WellPoint STD Plan, defines "elimination period" as "the number of calendar days at the beginning of a continuous period of *Disability* for which no benefits are payable." (AR at 191) (italics in original). It begins on the day an employee becomes disabled. (*Id.* at 182). Under the WellPoint LTD Plan, the payment of long term disability benefits is subject to an "elimination period" of 180 days or the expiration of the employee's short term disability benefits, whichever is longer. (*Id.* at 175).

**9.** "Material and Substantial Duties" are defined under the WellPoint LTD Plan as "the necessary functions of *Your Regular Occupation* which cannot be reasonably omitted or altered." (AR at 191) (italics in original).

**10.** "Regular Occupation" is defined under the WellPoint LTD Plan as "the occupation that *You* are performing for income or wages on *Your Date of Disability*. It is not limited to the specific position *You* held with *Your* employer." (AR at 192) (italics in original). This definition is identical to that found in the WellPoint STD Plan. (*Id.* at 157).

**11.** An individual, such as plaintiff, who was 63 years of age on the date her disability commenced, is entitled to a maximum benefit period of 36 months under the WellPoint LTD Plan. (AR at 176 & 185).

60% of *Monthly Earnings* to a maximum benefit of $13,757.00 per month subject to reduction by deductible sources of income or *Disability Earnings*.

(AR at 175) (italics in original).

## III. PLAINTIFF'S CLAIMS FOR BENEFITS.

### A. *July 2001 Claim.*

Plaintiff began treatment with Dr. John Y. Hess, a cardiologist with the Regional Heart Center of Thousand Oaks, on February 12, 2001. (AR at 16 & 35–36). At that time, plaintiff complained of palpitations, which apparently were made worse by thyroid replacement therapy. (*Id.* at 35–36). An echocardiogram study conducted on March 23, 2001, revealed some cardiac abnormalities. (*Id.* at 105–06).

On July 15, 2001, plaintiff was admitted to the hospital due to atrial fibrillation and evidence of tachycardia/bradycardia syndrome.[12] (AR at 16, 31, 35 & 113–18). She complained of "irregular palpitations both fast and slow with dizziness and some shortness of breath." (*Id.* at 113). Various medical tests revealed significant bradyarrhythmias and sick sinus syndrome,[13] and plaintiff was diagnosed with sick sinus syndrome, diabetes, and hypothyroidism. (*Id.* at 31, 70 & 113). Plaintiff underwent surgery for the insertion of a pacemaker to control her cardiac arrhythmia, and she was discharged from the hospital on July 19, 2001. (*Id.* at 16, 31, 35 & 113). Because of her medical condition, plaintiff

sought and received an approved leave of absence from work in July 2001, with her last day of work occurring on July 13, 2001. (*Id.* at 2, 6 & 16).

On July 22, 2001, two days after her hospital discharge, plaintiff completed and submitted a Disability Claim Form for short term disability benefits, Claim No. 9525041212. (AR at 16–17). She listed the nature of her disability as "irregular heart beat—pacemaker insertion." (*Id.* at 16). She also provided that her employment duties included "review of medical records, data entry[.] No physical demands." (*Id.*). Dr. Hess completed a portion of the form, listing plaintiff's diagnosis as tachycardia/bradycardia syndrome, and stated that plaintiff's disability began on July 15, 2001. (*Id.*). Dr. Hess estimated that plaintiff would be able to return to work on August 15, 2001. (*Id.*).

Defendant CNA accepted plaintiff's claim and began paying her short term disability benefits under the STD Plan on July 22, 2001, following the seven-day elimination period.[14] (AR at 1, 4, 11 & 13). In accepting plaintiff's claim, CNA stated that disability benefits would continue through August 14, 2001, due to plaintiff's estimated return to work date of August 15, 2001. (*Id.* at 4 & 11). Plaintiff's weekly benefit under the STD Plan, reduced by the California Compulsory Disability Benefit Law, was $481.72. (*Id.* at 4, 9, 11 & 13).

Subsequently, Dr. Hess recommended a revised return to work date of September

---

12. "Tachycardia" is defined as a "[r]apid beating of the heart, conventionally applied to rates over 100 per minute." *Stedman's Medical Dictionary* (26th ed.1995) at 1758. "Bradycardia" is defined as a "[s]lowness of the heartbeat, usually defined (by convention) as a rate under 60 beats per minute." *Id.* at 230.

13. "Sick sinus syndrome" is a medical condition with "symptoms ranging from dizziness

to unconsciousness due to chaotic or absent atrial activity often with bradycardia alternating with tachycardia, recurring ectopic beats including escape beats, and runs of supraventricular and ventricular arrhythmias." *Stedman's Medical Dictionary* at 1741.

14. The seven-day elimination period lasted from July 15, 2001, to July 21, 2001. (AR at 1, 4, 11 & 13).

4, 2001, due to reprogramming of plaintiff's pacemaker and a change in plaintiff's medications. (AR at 1 & 12). Based on this recommendation, plaintiff's short term disability benefits were extended through September 3, 2001. (*Id.* at 1 & 8). Plaintiff returned to work in September 2001, and her claim consequently was closed. (*Id.* at 1).

### B. December 2001 Claim.

Plaintiff continued to work for Blue Cross until December 7, 2001, at which time she permanently left her employment with the company due to "continued problems" with her medical condition. (AR at 19, 20, 28, 52 & 70). Specifically, plaintiff stated that "any physical or mental exertion caused atrial fibrillation" and that she was "very sensitive" to changes in blood pressure and heart rate. (*Id.* at 28). She also indicated that after the insertion of her pacemaker and "numerous medications" for hypertension and tachycardia, she continued to experience "increased pulse rates and cardiac arrythmias" over the course of several months and "realized that [she] could not continue working." (*Id.* at 70).

On December 16, 2001, plaintiff completed and submitted a second Disability Claim Form for short term disability benefits, Claim No. 9525041213. (AR at 20). Plaintiff listed the nature of her disability as "cardiac arrhythmia [and] sick sinus syndrome." (*Id.*). She also indicated that she was receiving, or entitled to receive, state disability benefits and described her job duties as "data entry [and] review of medical records." (*Id.*). Her treating physician, Dr. Edward B. Portnoy, an internist, completed a portion of the form,

listing plaintiff's diagnosis as cardiac arrhythmia disorder and sick sinus syndrome, and provided that plaintiff's disability began on December 7, 2001. (*Id.*). Dr. Portnoy also estimated that plaintiff would be able to return to work on February 1, 2002. (*Id.*).

Defendant CNA initially accepted plaintiff's claim and began paying her short term disability benefits under the STD Plan on December 15, 2001, following the seven-day elimination period.[15] (AR at 52). At that time, CNA approved disability benefits through January 31, 2002, due to plaintiff's estimated return to work date of February 1, 2002. (*Id.*). Plaintiff's weekly benefit under the STD Plan, reduced by the California Compulsory Disability Benefit Law, was $481.72. (*Id.* at 52, 125 & 129).

Defendant CNA thereafter extended plaintiff's short term disability benefits on three occasions, specifically extending her benefits through February 15, 2002, (AR at 54 & 82), through February 22, 2002, (*id.* at 81), and again through March 1, 2002, (*id.* at 55). CNA first extended benefits based on a request submitted by Dr. Hess on January 30, 2002, in which he stated that plaintiff was still disabled and would not be able to return to work until April 1, 2002. (*Id.* at 27, 84 & 99). According to CNA, benefits thereafter were approved in order to allow plaintiff "to adjust to the medication after the input of a pacemaker and all testing to be completed," including a Holter monitor test.[16] (*Id.* at 24–25, 61 & 64). Each time CNA extended plaintiff's benefits, CNA informed plaintiff, "[y]our claim will be reviewed on a continuing basis and benefits will be

---

**15.** The seven-day elimination period lasted from December 8, 2001, to December 14, 2001. (AR at 27, 52 & 125).

**16.** A "Holter monitor" is "a technique for long-term, continuous recording of electro-

cardiographic signals on magnetic tape for scanning and selection of significant but fleeting changes that might otherwise escape notice." *Stedman's Medical Dictionary* at 1125.

provided while you remain disabled." (*Id.* at 54–55 & 81–82).

On March 4, 2002, however, defendant CNA terminated plaintiff's short term disability benefits. (AR at 23, 56–58 & 72–75). CNA expressly based its decision on "a telephone interview with [plaintiff] and the medical documentation which has been received and reviewed." (*Id.* at 72). In denying plaintiff's claim, CNA stated, in part:

> During a telephone conversation with you on 2/15/02, you indicated you were capable of driving, performing self care, housework and going to water aerobics. You indicated you were not capable of a return to work due to an uncontrolled heart rate with any type of stress. You also indicated you have shortness of breath with the increased heart rate.

> Upon review of your file, you were initially disabled due to coronary heart disease, sick sinus syndrome and then stress related atrial fibrillation. The result of the Holter Monitor test, in addition to the physical examination findings, fail to indicate an impairment that would prevent you from performing the duties of your occupation as a Clinical Research Manager. The duties of a Clinical Research Manager are sedentary in nature, and your activities of daily living indicate you are functioning above a sedentary level as reflected in your Holter Monitor report. We regret to inform you there is insufficient medical evidence in our file to support a continued functional impairment or your inability to return to work beyond the current paid through date of 3/1/02. Therefore, no additional benefits are payable.

(*Id.* at 57 & 74). CNA informed plaintiff that she could submit a formal request for reconsideration, within 180 days of CNA's decision to terminate benefits. (*Id.*).

On April 12, 2002, plaintiff requested reconsideration of the denial of her short term disability claim. (AR at 70). Plaintiff submitted a letter from Dr. Portnoy, dated April 12, 2002, and a letter from herself, also dated April 12, 2002, in support of her request for reconsideration. (*Id.* at 69–70). Dr. Portnoy, in his letter, opined that plaintiff was "totally disabled." (*Id.* at 69). Specifically, he stated:

> I am caring for the above patient whom I feel is totally disabled at this time. She suffers from organic heart disease. She is status post pacemaker implant and diabetes mellitus. These conditions are aggravated by stress at work. It is due to "stress" that this patient should be considered totally disabled for any occupation at this time.

(*Id.* at 69). Plaintiff, in her letter, detailed her specific job duties and responsibilities with Blue Cross. (*Id.* at 70). She also denied that she was doing any housework, a fact that CNA used in its initial denial of plaintiff's claim. (*Id.* at 57 & 70).

On April 24, 2002, defendant CNA denied plaintiff's request for reconsideration. (AR at 22, 59–60 & 67–68). Specifically, CNA stated, in part:

> Although[ ] Dr. Portn[o]y has stated you are disabled, there is no supporting documentation of an impairment related to an increase in heart rate or an arrhythmia that would preclude you from performing your required job duties as a Clinical Research Manager. We are unable to change our initial decision to terminate your benefits.

(*Id.* at 59 & 67). Defendant CNA also notified plaintiff that it had forwarded her claim for a formal appeal review. (*Id.* at 22, 60 & 68).

On May 29, 2002, plaintiff's appeal was denied and the decision to terminate plaintiff's benefits again was upheld. (AR at

61–62 & 64–65). In denying plaintiff's appeal, defendant CNA stated, in part:

The letter sent in with your appeal request from Dr. Portnoy stated you were unable to work because the stress would aggravate your conditions. He further stated it was due to "stress" that you should be considered totally disabled.

Please be advised that preventive measures (i.e. not working) for stress management does not qualify a person for disability benefits. This policy does not provide benefits based on the "possibility" of a disability. Your occupation involves data entry and reviewing of medical records. You have indicated that the job is in a very stressful environment. Although you have been advised to refrain from working in a stressful environment, the medical records do not support a functional impairment precluding you from working beyond the date benefits have been paid with any employer.

(*Id.* at 62 & 65). At this time, plaintiff had exhausted all administrative remedies relating to her claim; therefore, CNA stated that its decision was "final and binding." (*Id.*).

On June 19, 2002, plaintiff filed a complaint with the California DOI, seeking reevaluation of her claim by CNA. (AR at 50). Plaintiff stated in her complaint:

This company has denied short term disability since 3/1/02, based on the denial that I am not disabled. Both my physicians[,] i.e.[,] internal medicine and cardiologist[,] have stated [that] I am disabled, due t[o] a diagnosis of Sick Sinus Syndrome. I have a pacemaker and tried to go back to work, but have had multiple problems with sinus tachy-

cardia and arrythmias. I am on medication for the problems but stress seems to create the above problems. Both denial letters do not state any physician has reviewed the issues or contacted my physicians. This policy was offered by my employer along with my additional premium to help supplement my state disability. State disability has paid all along and has stated I am disabled based on my physician[s'] information.

(*Id.*). On July 5, 2002, plaintiff sent all correspondence relating to the denial of her claim to the California DOI. (*Id.* at 51).

In response to plaintiff's complaint, the California DOI wrote to CNA on July 12, 2002, requesting that it reevaluate plaintiff's claim "and in no later than twenty-one (21) days inform [plaintiff] in writing of the results." (AR at 49). The California DOI also requested a copy of CNA's complete file relating to plaintiff's claim. (*Id.*). CNA responded in writing to the California DOI on July 19, 2002, stating that it would refer plaintiff's file to a medical consultant for review. (*Id.* at 44). CNA also indicated that it would reevaluate plaintiff's claim and that a decision would be made "within the time frame allotted of 21 days." [17] (*Id.*).

In reevaluating plaintiff's claim, CNA had Dr. Eugene Truchelut, an internist, review plaintiff's file. (AR at 42). This was the first time in its handling of plaintiff's claim that CNA sought to have plaintiff's records reviewed by a doctor. Prior to this time, defendant CNA only sought medical review from its own in-house nurses. (*See, e.g., id.* at 25, 56–60, 67–68 & 73–75).

CNA provided a summary of plaintiff's file to Dr. Truchelut on its Physician Re-

---

**17.** Subsequently, 21 days passed, and the California DOI wrote to defendant CNA on August 9, 2002, stating that it had not yet received the "anticipated follow up" to CNA's

July 19, 2002 letter. (AR at 38). At that time, the California DOI again requested a copy of CNA's complete claim file. (*Id.*).

view Form, stating only that plaintiff's "test results do not appear to be abnormal and [her] occupation includes data entry and review of medical records." (AR at 40). CNA asked Dr. Truchelet to state his opinion as to whether the findings of plaintiff's physician, including restrictions of no work due to stress, would prevent plaintiff from performing the duties of her occupation. (*Id.*).

On August 5, 2002, after reviewing plaintiff's claim, Dr. Truchelut submitted his report. (AR at 31–33). Notably, he indicated that no information was given regarding the physical demands of plaintiff's job and that the only description of plaintiff's job duties was "data entry and review of medical records." (*Id.* at 31). Dr. Truchelut summarized plaintiff's medical history and concluded that "the recent medical records provided [ ] do not support an inability by [plaintiff] to perform the types of work activities which you refer to, at least from the physical standpoint." (*Id.* at 32). Although he stated that plaintiff's "most recent Holter monitor did not show evidence of significant arrhythmias, and her pacemaker was functioning normally," he noted that "[t]he issue of psychological stress impacting on her occupational abilities is idiosyncratic, and not able to be quantified by these types of tests." (*Id.* at 33). Based on the medical records provided, Dr. Truchelut concluded that plaintiff would be capable of performing light duty work. (*Id.* at 32–33).

On August 12, 2002, CNA received two letters, dated May 15, 2002 and August 1, 2002, written by plaintiff's cardiologist Dr. Hess and submitted by plaintiff to be used in reevaluating her claim.[18] (AR at 35–37). In the May 15, 2002, letter, Dr. Hess stated, in part:

Unfortunately, [plaintiff's cardiac] rhythms have been very difficult to manage in spite of the combination of pacemaker and medication therapy. She continued to have breakthroughs in cardiac rhythm abnormality in spite of multiple medication changes. The paperwork from all her office visits and pacemaker checks has been enclosed. It became fairly clear that the burden of long hours and stressful work situations complicated her rhythm management in that returns to work have been associated with exacerbation in cardiac arrhythmias.

She remains in intermittent control of cardiac arrhythmias on a combination of Toprol XL, 25 mg b.i.d., Synthroid, 0.088 mg, Micronase, 10 b.i.d., Avandia, 8 q.d., Glucophage, 500 q.d. and Hyzaar, 50 mg/ 12.5 q.d.

On physical examination, at last visit her ... diagnosis remained sick sinus syndrome with paroxysmal atrial fibrillation. There is a strong stress component to this rhythm abnormality. Her prognosis is related to future rhythm control and to the need for anticoagulation therapy. This rhythm abnormality will likely be present for life.

(*Id.* at 35). In his August 1, 2002, letter, Dr. Hess provided:

I have been involved with [plaintiff's] care since before February of 2001. Initially, she was seen for problems of palpitations. Over time, these rhythm disturbances grew much worse, requiring multiple medications and pacemaker implantation. Stress seemed to complicate the rhythm issues and absences from work resulted in some improvement in the rhythm abnormalities with greater ease in their management. Heavy case-

18. Defendants do not rebut plaintiff's argument that CNA did not provide these letters to Dr. Truchelut for his review, and the court cannot find any indication in the record indicating that Dr. Truchelut did, in fact, review the letters.

loads of work with difficulty in dealing with clients all contributed to worsening of the rhythm problems. For that reason, it was recommended that she will remain off work permanently so that we might better manage these difficult-to-control cardiac rhythm abnormalities.

(*Id.* at 36).

On August 12, 2002, the same day CNA received Dr. Hess' letters, CNA denied plaintiff's claim and upheld its previous decision to terminate plaintiff's benefits. (AR at 42–43). CNA indicated that it had received Dr. Hess' letters, but rejected them, stating that they did not "effect the outcome of [CNA's] decision since there were no findings included that would conclude you were unable to work." (*Id.* at 42). In denying plaintiff's claim, CNA stated, in relevant part:

The medical consultant concluded that the medical records provided do not support your inability to perform the duties of your occupation based on any physician findings. The negative Bruce protocol treadmill test completed December 19, 2001 did not suggest ischemic heart disease. It was also noted that you were able to exercise well into stage II, which correlates with the ability to perform light level exercise. Also the latest Holter Monitor test did not show any evidence of significant arrhythmias and the pacemaker was functioning well.

The letters from Dr. Hess still reiterate[ ] that working/stress would worsen the problems. Dr. Hess also stated that your rhythm abnormality would likely be present [for] life. Again we do not have any medical documentation that would confirm your inability to perform the duties of your occupation.

As stated previously, preventive measures (i.e. not working) for stress management does not qualify a person for disability benefits. The policy does not provide benefits based on the "possibili-

ty" of a disability. The fact that your job may be stressful is not a disability. (*Id.* at 42–43). CNA copied the California DOI in its denial letter to plaintiff. (*Id.* at 43).

## *DISCUSSION*

### I. REQUESTS FOR JUDICIAL NOTICE.

■ As an initial matter, the court addresses the various requests for judicial notice filed by the parties from July 16, 2004, through March 31, 2005. Each of the requests for judicial notice relates to the California DOI's revocation of its approval of discretionary clauses in disability insurance policies and the impact of such revocation on the standard of review in ERISA disability cases.

Specifically, plaintiff asks the court to take judicial notice of: (1) a letter opinion and notice issued by the California DOI, withdrawing approval of disability insurance policies containing discretionary clauses, (Plaintiff's Supplemental Brief at 1–2 & Exhs. A & B); (2) the California DOI's response to the petitioner's opening brief in *In Matter of Withdrawal of Policy Form Approval for: Unum Life Ins. Co. of America, et al.*, File No. AHB–PF–04–01, (Plaintiff's Request for Judicial Notice at 1 & Exh. A); (3) the transcript of oral argument and tentative ruling in *Rosten v. Sutter Health Long–Term Disability Plan*, Case No. C 03–4597 JSW, filed in the United States District Court for the Northern District of California, (*id.* at 1 & Exh. B); (4) *Fenberg v. Cowden Automotive Long Term Disability Plan*, 2004 WL 2496174 (N.D.Cal.2004), (Plaintiff's Second Request for Judicial Notice at 1 & Exh. A); (5) a proposed decision by the California DOI Administrative Hearing Bureau, filed on March 22, 2005, affirming the California DOI's withdrawal of approval of disability insurance policies containing dis-

cretionary clauses, (Plaintiff's Third Supplemental Request for Judicial Notice at 1 & Exh. 1); and (6) an Order by Insurance Commissioner John Giramendi, filed on March 22, 2005, adopting a Proposed Decision Provision for Vacating Order Upon Amendment of Forms, (id at 2 & Exh. 2).

Defendants asked the court to take judicial notice of: (1) *Firestone v. Acuson Corp. Long Term Disability Plan*, 326 F.Supp.2d 1040 (N.D.Cal.2004), (Defendants' Request for Judicial Notice at 1 & Exh. A); (2) an Order issued in *Worden v. Metropolitan Life Ins. Co.*, Case No. CV 03–7489 RSWL (SHx), filed in the United States District Court for the Central District of California, (*id.* at 2 & Exh. B); (3) an Order issued in *Washington v. Standard Ins. Co.*, Case No. CV 03–4287 MMC, filed in the United States District Court for the Northern District of California, (Defendants' Supplemental Request for Judicial Notice at 1 & Exh. C); (4) an Order issued in *Andritzakis v. Yahoo! Inc.'s Long Term Disability Ins. Plan*, Case No. C 03–02467 JF, filed in the United States District Court for the Northern District of California, (Defendants' Second Supplemental Request for Judicial Notice at 1 & Exh. D); (5) an Order issued in *Hansen v. Unum Life Ins. Co. of America*, Case No. CIV S–03–1230 FCD (PAN), filed in the United States District Court for the Eastern District of California, (Defendants' Third Supplemental Request for Judicial Notice at 1 & Exh. E); and (6) *Horn v. Provident Life & Accident Ins. Co.*, 351 F.Supp.2d 954 (N.D.Cal.2004), (Defendants' Fourth Supplemental Request for Judicial Notice at 2 & Exh. F).

Under the Federal Rules of Evidence, "[a] judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R.Evid. 201(b). "A court shall take judicial notice if requested by a party and supplied with the necessary information." Fed.R.Evid. 201(d).

■ It is well established that "[a] court may take judicial notice of records and reports of administrative bodies," such as notices and opinion letters issued by the California DOI. *Wible v. Aetna Life Ins. Co.*, 375 F.Supp.2d 956, 965 (C.D.Cal.2005) (internal quotation marks omitted) (taking judicial notice of the February 26, 2004, opinion letter issued by the California DOI); *see also Toth v. Automobile Club of California Long Term Disability Plan*, 2005 WL 1877150 at *23 n. 237 (C.D.Cal. 2005) (taking judicial notice of the February 27, 2004, Notice issued by the California DOI). Furthermore, a court may take judicial notice of the final decisions of other district courts, including decisions regarding the applicable standard of review in ERISA disability cases. *See Wible*, 375 F.Supp.2d at 965 (a court may take judicial notice of "documents that are public records and capable of accurate and ready confirmation by sources that cannot reasonably be questioned"); *Toth*, 2005 WL 1877150 at *23 n. 237 (taking judicial notice of "the final decisions of other district courts regarding the effect of the February 27, 2004 Notice [by the California DOI] on the standard of review in ERISA disability cases," including the final decisions in *Fenberg, Firestone, Hansen*, and the transcript of oral argument and tentative ruling in *Rosten* ). Finally, the court notes that in the context of ERISA cases, a court is permitted to review evidence outside of the administrative record in order to determine the standard of review. *Wible*, 375 F.Supp.2d at 966.

Based on the foregoing, the court grants each of the parties' requests for judicial

notice and takes judicial notice of the documents set forth above.

## II. STANDARD OF REVIEW.

The parties disagree as to whether the court should review CNA's termination of plaintiff's benefits under a de novo or abuse of discretion standard of review.

■ "Although ERISA establishes a right to judicial review of benefits decisions, the statute does not set forth the appropriate standard of review for such determinations." *Hensley v. Northwest Permanente P.C. Retirement Plan & Trust*, 258 F.3d 986, 994 (9th Cir.2001), *cert. denied*, 534 U.S. 1082, 122 S.Ct. 815, 151 L.Ed.2d 699 (2002); *see also Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 108–09, 109 S.Ct. 948, 953, 103 L.Ed.2d 80 (1989) ("Although it is a comprehensive and reticulated statute, ERISA does not set out the appropriate standard of review for actions under § 1132(a)(1)(B) challenging benefit eligibility determinations."). The United States Supreme Court, however, in *Firestone*, addressed the standard of review to be applied in reviewing ERISA benefit determinations, holding that a denial of benefits challenged under ERISA "is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone*, 489 U.S. at 115, 109 S.Ct. at 956–57; *see also Abatie v. Alta Health & Life Ins. Co.*, 421 F.3d 1053, 1059 (9th Cir.2005) ("the default rule" is that "courts review [an] administrator's denial [of benefits] de novo" except where a benefit plan gives the administrator or fiducia-

ry discretion to determine eligibility for benefits or to construe the terms of the plan); *Lamantia v. Voluntary Plan Administrators. Inc.*, 401 F.3d 1114, 1122–23 (9th Cir.2005) (same). If a benefit plan "unambiguously" gives an administrator or fiduciary the discretionary authority to determine eligibility for benefits or to construe the terms of the plan, the denial of benefits is reviewed for an abuse of discretion.[19] *Abatie*, 421 F.3d 1053, 1059.

Accordingly, "[t]he court must examine the specific language of a plan to determine the standard of review." *Shane v. Albertson's Inc. Employees' Disability Plan*, 2005 WL 1902130 at *1 (C.D.Cal. 2005). Indeed, "[t]he standard of review depends on whether 'the plan documents unambiguously say in sum or substance that the Plan Administrator or fiduciary has authority, power, or discretion to determine eligibility or to construe the terms of the Plan[.]'" *Abatie*, 421 F.3d 1053, 1059 (quoting *Sandy v. Reliance Standard Life Ins. Co.*, 222 F.3d 1202, 1207 (9th Cir. 2000)); *see also Bergt v. Retirement Plan for Pilots Employed by MarkAir, Inc.*, 293 F.3d 1139, 1142 (9th Cir.2002) ("the plan documents must grant this discretionary authority unambiguously"). However, "there is no requirement that the word 'discretion' be used." *Abatie*, 421 F.3d 1053, 1059.

■ When the standard of review is for abuse of discretion, a district court may review only the evidence that was presented to the plan administrator or fiduciary. *Banuelos v. Construction Laborers' Trust Funds for Southern California*, 382 F.3d 897, 904 (9th Cir.2004), *cert. denied*, ——

---

**19.** The Ninth Circuit has used interchangeably the phrases "arbitrary and capricious" and "abuse of discretion;" however, "[a]ny difference between the two standards ... is in name only." *Hensley*, 258 F.3d at 994 n. 4; *see also Taft v. Equitable Life Assurance Soci-*

*ety*, 9 F.3d 1469, 1471 n. 2 (9th Cir.1993) (the terms "arbitrary and capricious" and "abuse of discretion" used to describe the deferential standard of review in ERISA cases is "a distinction without a difference") (internal quotation marks omitted)).

U.S. ——, 125 S.Ct. 2936, 162 L.Ed.2d 866 (2005); *Taft*, 9 F.3d at 1471. Under an abuse of discretion standard, a court "cannot substitute [its] judgment for the administrator's;" rather, the court "can set aside the administrator's discretionary determination only when it is arbitrary and capricious." *Jordan v. Northrop Grumman Corp. Welfare Benefit Plan*, 370 F.3d 869, 875 (9th Cir.2004). "ERISA plan administrators abuse their discretion if they render decisions without any explanation, or construe provisions of the plan in a way that conflicts with the plain language of the plan." *Taft*, 9 F.3d at 1472 (internal quotation marks omitted); *see also Boyd v. Bert Bell/Pete Rozelle NFL Players Retirement Plan*, 410 F.3d 1173, 1178 (9th Cir.2005) (same). An administrator also abuses its discretion "if it relies on clearly erroneous findings of fact in making benefit determinations," *Taft*, 9 F.3d at 1473, "fails to develop facts necessary to make its determination," *Schikore v. BankAmerica Supplemental Retirement Plan*, 269 F.3d 956, 960 (9th Cir.2001), or "arbitrarily refuse[s] to credit a claimant's reliable evidence," *Jordan*, 370 F.3d at 879 (internal quotation marks omitted). In addition, "an error of law constitutes an abuse of discretion." *Schikore*, 269 F.3d at 960. However, "a decision grounded on *any* reasonable basis" is not an abuse of discretion. *Jordan*, 370 F.3d at 875 (italics in original) (internal quotation marks omitted).

By contrast, when the standard of review is de novo, a court may, in its discretion, examine evidence outside the administrative record.[20] *Banuelos*, 382 F.3d at 904; *Mongeluzo*, 46 F.3d at 943–44. Under a de novo standard of review, the court does not need to give any deference to the administrator's exercise of discretion. *McDaniel v. Chevron Corp.*, 203 F.3d 1099, 1108 (9th Cir.2000); *Lang v. Long–Term Disability Plan of Sponsor Applied Remote Technology*, 125 F.3d 794, 798 (9th Cir.1997); *Gaines*, 329 F.Supp.2d at 1211.

Here, both the STD and LTD Plans contain language that unambiguously confers discretionary authority on CNA and WellPoint. (AR at 147, 158, 179 & 193). Specifically, both Plans provide that "[w]hen making a benefit determination under the polic[ies], *We* have discretionary authority to determine *Your* eligibility for benefits and to interpret the terms and provisions of the policy."[21] (*Id.* at 147 & 179) (italics in original). In addition, the Plans state that "[t]he Administrator and other Plan fiduciaries have discretionary authority to interpret the terms of the Plan[s] and to determine eligibility for and entitlement to benefits in accordance with the Plan[s]." (*Id.* at 158 & 193).

■ Although plaintiff acknowledges that the subject Plans confer discretionary authority on defendants, (Plaintiff's Trial Brief at 12 & Plaintiff's Response Brief at 2), she argues that the de novo standard of review is nonetheless applicable because the California DOI withdrew its approval of discretionary clauses such as those set forth in the instant STD and LTD Plans. (Plaintiff's Supplemental Authority at 2, Plaintiff's Supplemental Brief at 2–14 &

---

**20.** In most cases when the de novo standard of review is applied, however, the court "should only look at the evidence that was before the plan administrator ... at the time of the determination." *Mongeluzo v. Baxter Travenol Long Term Disability Benefit Plan*, 46 F.3d 938, 944 (9th Cir.1995) (internal quotation marks omitted); *see also Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1090–91 (9th Cir.), *cert. denied*, 528 U.S. 964, 120 S.Ct. 398, 145 L.Ed.2d 310 (1999) (same).

**21.** Under both Plans, "We" refers to defendant CNA, and "Your" refers to "the employee to whom this certificate is issued and whose insurance is in force under the terms of the policy." (AR at 157 & 192).

Plaintiff's Supplemental Reply Brief at 1–10). Plaintiff also asserts that she is entitled to de novo review because CNA acted with an inherent conflict of interest. (Plaintiff's Trial Brief at 12–14, Plaintiff's Response Brief at 2 & Plaintiff's Supplemental Reply Brief at 11–12). Specifically, plaintiff contends that CNA: (1) discounted any evidence supporting disability; (2) disregarded plaintiff's self-reporting; (3) failed to acknowledge the causal relationship between stress and cardiovascular disease; (4) mis-classified plaintiff's job; (5) failed to obtain an independent medical review by a physician prior to the initial termination of benefits; (6) failed to obtain review by a cardiologist rather than a non-specialist on appeal; and (7) disregarded the opinion of its medical reviewer that the impact of stress on occupational capability is idiosyncratic and not measurable by objective testing. (Plaintiff's Trial Brief at 14–21 & Plaintiff's Response Brief at 2–3).

A. *Enforceability of Discretionary Clauses.*

On February 27, 2004, the California DOI issued a Notice To Withdraw Approval and Order For Information ("Notice") to all disability insurers doing business in California, withdrawing its approval of discretionary clauses in disability insurance policies that "purport to confer on the insurer discretionary authority to determine eligibility for benefits and to interpret the terms and provisions of the policy." (Plaintiff's Supplemental Authority, Exh. A at 3 & Plaintiff's Third Supplemental Request for Judicial Notice, Exh. 1 at 20). The Notice provided that such discretionary clauses "render the contract 'fraudulent or unsound insurance' within the meaning of [California] Insurance Code § 10291.5," and "effectively negate[ ] operative terms of the contract," making it "unintelligible, uncertain, ambiguous, abstruse and likely to mislead the insured, in violation of [California] Insurance Code

§ 10291.5(b)(1)." (*Id.*). The Notice specifically included UNUM Life Insurance Company Forms CFP.1 and CCFP.1, Provident Life and Accident Insurance Company Form LTD83702–CA, Hartford Life Insurance Company Forms Z–LTD and GLT–44278, Hartford Life and Accident Insurance Company Forms Z–LTD, Z–LTD C001, and GLT–044412, and Metropolitan Life Insurance Company Form G24303. (Plaintiff's Supplemental Authority, Exh. A at 7 & Plaintiff's Third Supplemental Request for Judicial Notice, Exh. 1 at 21). The Notice did not refer to the instant STD or LTD Plans. (*Id.*).

Virtually every court that has addressed the California DOI's Notice and its impact on the standard of review in ERISA cases has rejected the argument that the Notice entitles plaintiffs to a de novo standard of review. *See Moskowite v. Everen Capital Corp.*, 2005 WL 1910941 at *5 (N.D.Cal. 2005); *Williston v. Norwood Promotional Products, Inc.*, 2005 WL 1877136 at *6–7 (C.D.Cal.2005); *Davison v. Hartford Life and Accident Ins. Co.*, 2005 WL 807045 at *1 (N.D.Cal.2005); *Mitchell v. Aetna Life Ins. Co.*, 359 F.Supp.2d 880, 888–89 (C.D.Cal.2005); *Toth*, 2005 WL 1877150 at *23–27; *Horn*, 351 F.Supp.2d at 959–65; *Firestone*, 326 F.Supp.2d at 1049–51; *cf. Fenberg*, 2004 WL 2496174 at *2–3.

In addition, the United States Supreme Court has expressly approved of the use of discretionary clauses in insurance disability policies. *See Davison*, 2005 WL 807045 at *1 ("the United States Supreme Court has held [that] a 'benefit plan [may] give[ ] the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan'") (quoting *Firestone*, 489 U.S. at 115, 109 S.Ct. at 956–57)); *see also Moskowite*, 2005 WL 1910941 at *5 (same). Therefore, the inclusion of discretionary clauses is not a breach of fiduciary duty under

ERISA and does not entitle a plaintiff to a de novo standard of review. *Moskowite*, 2005 WL 1910941 at *5; *Davison*, 2005 WL 807045 at *1.

Furthermore, a "defendant should be entitled to rely on any prior approval of [an insurance] policy by the DOI, because such approval necessitate[s] a finding by the DOI that said policy d[oes] not contain provisions that are 'unintelligible, uncertain, ambiguous, or abstruse, or likely to mislead a person to whom the policy is offered, delivered or issued.' " *Moskowite*, 2005 WL 1910941 at *5 (quoting Cal. Ins. Code § 10291.5(b)(1)); *see also Davison*, 2005 WL 807045 at *1 n. 4 (same). Here, the California DOI approved the STD and LTD Plans on December 14, 1998, (Declaration of David J. Weinman In Support of Defendants' Post–Trial Supplemental Brief, Exh. F), and defendants were entitled to rely on such approval.

Finally, even assuming that the California DOI's Notice applies to the Plans at issue, the Notice "does not purport to invalidate disability policies containing discretionary clauses retroactively." *Toth*, 2005 WL 1877150 at *23. Indeed, any withdrawal of approval operates "only prospectively and not retrospectively." *Mitchell*, 359 F.Supp.2d at 889 (internal quotation marks omitted); *accord Firestone*, 326 F.Supp.2d at 1051; *see also Moskowite*, 2005 WL 1910941 at *5; *Williston*, 2005 WL 1877136 at *6; *Toth*, 2005 WL 1877150 at *24; *Horn*, 351 F.Supp.2d at 965 n. 5. In the present case, the California DOI's withdrawal of approval in 2004 does not apply retroactively to the STD and LTD Plans, which were issued in 2000. (AR at 141, 161, 164 & 196).

For the reasons stated above, the court rejects plaintiff's argument and declines to apply a de novo review based upon the California DOI's withdrawal of approval of discretionary clauses.

B. *Conflict of Interest.*

"The degree of judicial deference associated with [abuse of discretion] standard of review may . . . be affected by factors such as conflict of interest." *Lang*, 125 F.3d at 797 (citations omitted). Indeed, where a defendant has the "dual role as both the funding source and the administrator of [a][p]lan," that is an "inherent conflict of interest situation," *id.; see also Gaines*, 329 F.Supp.2d at 1211 ("[a]n apparent conflict exists, requiring further inquiry into the issue, when a plan is funded and administered by an insurer"), and "that conflict must be weighed as a facto[r] in determining whether there is an abuse of discretion," *Firestone*, 489 U.S. at 115, 109 S.Ct. at 957 (internal quotation marks omitted).

■ However, "the presence of conflict does not automatically remove the deference we ordinarily accord to ERISA administrators who are authorized by the plan to interpret a plan's provisions." *Lang*, 125 F.3d at 797. Rather, "[i]t is only when a serious conflict of interest exists that our standard of review changes." *Abatie*, 421 F.3d 1053, 1061; *see also Jordan*, 370 F.3d at 875 ("the standard of review changes with the existence of a 'serious' conflict only").

To determine whether a plan administrator operated under a "serious" conflict of interest, a two-part test, known as the "less deferential" standard, is applied. *Hensley*, 258 F.3d at 994; *see also Gaines*, 329 F.Supp.2d at 1212 ("[t]o determine whether such an apparent conflict has ripened into an actual conflict requires the Court to undertake an assessment of whether the conflict affects the decision," an assessment which "has been described as a 'less deferential' standard"). The "less deferential" standard has two steps:

First, we must determine whether the affected beneficiary has provided mate-

rial, probable evidence, beyond the mere fact of the apparent conflict, tending to show that the fiduciary's self-interest caused a breach of the administrator's fiduciary obligations to the beneficiary.[22] If not, we apply our traditional abuse of discretion review. On the other hand, if the beneficiary *has* made the required showing, the principles of trust law require us to act very skeptically in deferring to the discretion of an administrator who appears to have committed a breach of fiduciary duty.

*Atwood,* 45 F.3d at 1323 (italics in original). Indeed,

> [w]here the affected beneficiary has come forward with material evidence of a violation of the administrator's fiduciary obligation, we should not defer to the administrator's presumptively void decision.[23] In that circumstance, the plan bears the burden of producing evidence to show that the conflict of interest did not affect the decision to deny benefits. If the plan cannot carry that burden, we will review the decision de novo, without

deference to the administrator's tainted exercise of discretion.

*Id.*

■ In the present case, defendant CNA acted as both the insurer and administrator of the Plans. Therefore, CNA operated under an apparent conflict of interest in determining plaintiff's eligibility for benefits. As a result of this apparent conflict, the court must determine whether plaintiff has presented sufficient material and probative evidence to trigger a rebuttable presumption that CNA's conflict of interest affected its decision to deny benefits.

As stated above, plaintiff raises seven grounds based upon conflict of interest to support her contention that de novo review is applicable in this case. The court, however, will address only one of those grounds, namely, whether defendant CNA mis-classified and/or minimized plaintiff's job responsibilities throughout its handling of plaintiff's claim and appeal. (*See* Plaintiff's Trial Brief at 15 & 20–21 & Plaintiff's Response Brief at 3–7).

---

22. "While [t]he Ninth Circuit has never explicitly defined the parameters or contours of what might suffice to constitute a breach of fiduciary duty in this context, it has without declaring an exhaustive list, stated that material, probative evidence may consist of inconsistencies in the plan administrator's reasons, insufficiency of those reasons, or procedural irregularities in the processing of the beneficiaries claims." *Wible,* 375 F.Supp.2d at 968 (internal quotation marks omitted) (plan administrator breached fiduciary duty by ignoring medical opinions, failing to obtain its own competent medical opinions, deliberately considering only evidence pointing to denial, and failing to conduct an adequate investigation prior to denying plaintiff's claim); *see also Friedrich v. Intel Corp.,* 181 F.3d 1105, 1110 (9th Cir.1999) (plan administrator's failure to follow its own policy and ERISA's mandatory procedures is sufficient to establish breach of fiduciary duty); *Lang,* 125 F.3d at 798–99 (inconsistencies in administrator's denial of

claim are sufficient to establish breach of fiduciary duty); *Firestone,* 326 F.Supp.2d at 1052 ("[W]hen evaluating the possibility of . . . a breach [of fiduciary duty], [the Ninth Circuit] has appeared to focus upon procedural irregularities or structural inconsistencies within the plan administrator's decision-making process, rather than the substantive accuracy of the administrator's decision-making.").

23. In fact, "a rebuttable presumption arises in favor of the participant" tending to show that the fiduciary's self interest caused a breach of the administrator's fiduciary obligations to the beneficiary. *Tremain v. Bell Industries, Inc.,* 196 F.3d 970, 976 (9th Cir. 1999); *see also Nord v. Black & Decker Disability Plan,* 356 F.3d 1008, 1010 (9th Cir.), *cert. denied,* —— U.S. ——, 125 S.Ct. 62, 160 L.Ed.2d 20 (2004) (same); *Alford v. DCH Foundation Group Long–Term Disability Plan,* 311 F.3d 955, 957 (9th Cir.2002) (same).

Although plaintiff initially stated in a one-page standard form that her job involved "data entry [and] review of medical records," (AR at 16 & 20), she later clarified her job description for CNA in a letter dated April 12, 2002. (*Id.* at 70). In that letter, plaintiff specified that her job included "much more than data entry and record review." (*Id.*). According to plaintiff, she was responsible, as a Clinical Research Manager, for handling a case load of approximately 135 cases, each of which had to be closed within 30 days, handling expedited appeals, each of which had to be closed within three days, training new employees, and attending three to five employee management meetings a week, which lasted anywhere from one to four hours. (*Id.*). Plaintiff repeatedly emphasized that her job was a stressful one. (*Id.* at 24, 28 & 70).

Plaintiff also submitted letters from her doctors, in which they stated that her job was stressful and aggravated her physical condition. (AR at 35–36 & 69). For example, in a letter dated May 12, 2002, Dr. Hess stated that "[i]t became fairly clear that the burden of long hours and stressful work situations complicated [plaintiff's] rhythm management in that returns to work have been associated with exacerbation in cardiac arrhythmias." (*Id.* at 35). Dr. Hess further stated, in a letter dated August 1, 2002, that "[h]eavy caseloads of work with difficulty in dealing with clients all contributed to worsening of the rhythm problems." (*Id.* at 36). He even noted that "absences from work resulted in some improvement in [plaintiff's] rhythm abnormalities with greater ease in their management," further supporting the stress correlation between plaintiff's condition and her job and Dr. Hess' opinion that plaintiff should permanently remain out of work. (*Id.*). Dr. Portnoy also indicated in a letter dated April 12, 2002, that plaintiff "is status post pacemaker implant and diabetes mellitus. These conditions are aggravated by stress at work." (*Id.* at 69).

Defendant CNA, however, failed to fully consider this evidence in denying plaintiff's claim. It ignored plaintiff's own description of her employment responsibilities, even after she expressly told CNA that her job involved much more than entering data and reviewing medical records. Plaintiff's job title, Clinical Research Manager, alone denotes that as a manager at Blue Cross, a large company, she would have had more responsibilities than just data entry and record review. Moreover, the nature of the grievance and appeals department, where plaintiff was a manager, suggests that clients could potentially be difficult or demanding. Dr. Hess noted this in his August 1, 2002, letter. (AR at 36). Yet, CNA continued to characterize plaintiff's position and occupation as sedentary and simply involving data entry and medical records review. (*Id.* at 40, 62 & 65). For example, in its third denial of plaintiff's claim on May 29, 2002, after receiving plaintiff's letter setting forth her job responsibilities, CNA provided the following inaccurate generalization of plaintiff's job: "Your occupation involves data entry and reviewing of medical records." (*Id.* at 62 & 65).

In addition, CNA failed to provide its medical reviewers with an accurate description of plaintiff's employment duties. Indeed, Dr. Truchelet, who provided an independent medical review for CNA's reevaluation of plaintiff's claim, admitted that "[n]o information is given regarding the physical demands of [plaintiff's] occupation. You have indicated on the physician review form that the claimant's job includes data entry and review of medical records." (AR at 31). Furthermore, CNA did not provide Dr. Truchelet with the May 12, and August 1, 2002, letters from Dr. Hess, which set forth the stressful

nature and description of plaintiff's job duties (*e.g.*, long hours, heavy caseloads, difficulties in dealing with clients, etc.).

Finally, defendant CNA, if it disagreed with plaintiff's description of her job duties, failed to investigate or obtain its own description of those duties when it denied plaintiff's claim on four occasions, March 4, 2002, April 24, 2002, May 29, 2002, and August 12, 2002. As stated previously, "disability" is defined under the WellPoint STD Plan as:

> *Injury* or *Sickness* [that] causes physical or mental impairment to such a degree of severity that *You* are:
> 1. continuously unable to perform the *Material and Substantial Duties* of *Your Regular Occupation;* and
> 2. not working for wages in any occupation for which *You* are or become qualified by education, training or experience.

(AR at 149) (italics in original). "Material and Substantial Duties" mean "the necessary functions of *Your Regular Occupation* which cannot be reasonably omitted or altered," (*id.* at 156) (italics in original), and "Regular Occupation" means "the occupation that *You* are performing for income or wages on *Your Date of Disability.* It is not limited to the specific position *You* held with *Your* employer," (*id.* at 157) (italics in original).

Clearly, in making a determination regarding "disability" under the STD Plan, it is critical to accurately assess "the necessary functions" of plaintiff's specific job as a Clinical Research Manager with Blue Cross, as well as the functions of plaintiff's occupation as a clinical research manager. Yet, nowhere in CNA's denials, or in the Administrative Record for that matter, is there any attempt by CNA to make this assessment. Although CNA recognized that plaintiff viewed her job as stressful, (*see* AR at 59 & 67), it did not attempt to determine the necessary *functions* of that job or of her occupation. CNA's failure and/or unwillingness to determine the necessary functions of plaintiff's job can be seen, for example, in its August 12, 2002, denial of plaintiff's claim, in which CNA stated that it did "not have any medical documentation that would confirm [plaintiff's] inability to perform the duties of [her] occupation;" yet, CNA never set forth a description or the nature of those "duties." (*Id.* at 43). In fact, the *only* description of the necessary functions of plaintiff's job comes from plaintiff herself, which, as discussed above, CNA ignored.

Defendant CNA did not obtain a description of plaintiff's job responsibilities from her employer nor did it provide its reviewing doctor with any employer manual referencing the specifics of plaintiff's position. Furthermore, CNA failed to offer *any* vocational evidence describing the functions of an average clinical research manager, even though it consistently denied plaintiff's claim on the basis that the medical records failed to demonstrate that she was incapable of performing the duties of her "occupation" as a clinical research manager. (*Id.* at 43, 57, 59, 62, 65, 67 & 74). Such an inquiry was particularly warranted in this case, where there is a strong stress component to plaintiff's claim, and plaintiff is in her early sixties, has a pacemaker to control her cardiac arrhythmias, and is inflicted with diabetes.

It is unclear how CNA could repeatedly determine that plaintiff was not disabled under its plan definition of "disability" when CNA failed to obtain any vocational evidence regarding the occupation of a clinical research manager, ignored plaintiff's own description of her job functions, inaccurately described plaintiff's job functions to those reviewing plaintiff's claim, and failed to undertake any investigation into the specifics of plaintiff's job responsibilities. *See, e.g., O'Reilly v. Hartford Life*

& *Accident Ins. Co.*, 272 F.3d 955, 961 (7th Cir.2001) ("Before denying benefits, administrators of ERISA plans are required to have enough evidence to allow them to make a reasonable decision. ERISA does not require a 'full-blown' investigation, but it does demand a 'reasonable inquiry' into a claimant's medical condition and his vocational skills and potential.") (internal citation omitted)); *Martin v. Continental Casualty Co.*, 96 F.Supp.2d 983, 992 (N.D.Cal.2000) ("As a matter of logic, it would be impossible to review plan language with respect to a claim without making some characterization of the demands of the claimant's job tasks.").

In short, plaintiff has met her initial burden of producing material, probative evidence from which the court can infer that CNA's self-interest caused a breach of its fiduciary obligations to plaintiff. CNA, however, has presented no evidence demonstrating that its conflict of interest did not affect its decision to terminate plaintiff's benefits, *e.g.*, "by showing how its decision in fact benefitted the plan as a whole and therefore the rest of the beneficiaries under the plan" or by showing that "its decision was intended to prevent an unanticipated expenditure that would have depleted the resources available to other beneficiaries of the plan." *Lang*, 125 F.3d at 798. Accordingly, CNA's decision regarding plaintiff's disability is not entitled to deference and is subject to de novo review.

## III. THE MERITS OF PLAINTIFF'S CLAIM.

In performing this review de novo, the court reverses CNA's decision to terminate plaintiff's disability benefits, because CNA's denial was not determined on a sufficient basis. Plaintiff submitted letters from her treating physicians, Drs. Hess and Portnoy, to support her claim that she was disabled. (AR at 35–36 & 69). Both physicians opined that plaintiff was incapable of returning to work due to her medical condition, particularly noting that plaintiff's condition was aggravated by the stress of her work. (*Id.*). Specifically, Dr. Portnoy stated, "[i]t is due to 'stress' that this patient should be considered totally disabled for any occupation at this time." (*Id.* at 69). Dr. Hess stated that it is "fairly clear that the burden of long hours and stressful work situations complicated her rhythm management in that returns to work have been associated with exacerbation in cardiac arrhythmias." (*Id.* at 35). He also noted that there was a "strong stress component" to plaintiff's medical condition, with work "contribut[ing] to [the] worsening of [plaintiff's] [cardiac] rhythm problems." (*Id.* at 36). In addition, Dr. Hess stated that absences from work seemed to improve plaintiff's cardiac condition. (*Id.*).

Defendant CNA unreasonably discounted the opinions of both of these physicians on the basis that their opinions were unsupported by any objective medical evidence. (*See* AR at 42–43, 59 & 67). To support its determination, CNA relied on the opinion of its medical reviewer, Dr. Truchelut, that plaintiff's medical records, specifically the results of her Holter monitor test, did not show evidence of signifi-

cant arrhythmias that would prevent her from working "from [a] physical standpoint." (*Id.* at 32). CNA, however, selectively picked portions of Dr. Truchelet's report that would support its determination to terminate plaintiff's benefits. Notably, Dr. Truchelet stated that "[t]he issue of psychological stress impacting on [plaintiff's] occupational abilities is idiosyncratic, and not able to be quantified by these types of tests." (*Id.* at 33). CNA ignored this statement, continuing to insist that plaintiff provide objective medical evidence to support her condition. In addition, CNA failed to provide Dr. Hess' letters to Dr. Truchelet, which may have changed his opinion that plaintiff was capable of light duty work.

Also, CNA, as stated above, mischaracterized plaintiff's job duties in determining that she was not disabled. CNA consistently described plaintiff's occupation and employment with Blue Cross as sedentary, with duties of data entry and record review. CNA, moreover, failed to provide an accurate and complete description of plaintiff's employment responsibilities to its medical reviewer, Dr. Truchelet.

Finally, CNA appeared to ignore the fact that plaintiff was receiving state disability for her medical condition. (*See* AR at 50). While the state's disability determination is not binding on CNA, it is relevant in the analysis of plaintiff's claim. The purpose of CNA's disability plan and the State's disability plan are similar in that they are both intended to provide benefits to those unable to work because of a disability. Both programs evaluate a claimant's ability to work and require claimants to present extensive medical documentation in support of their claims.

For these reasons, the court finds that CNA's denial of benefits was unreasonable and reverses CNA's decision to terminate plaintiff's benefits.

### CONCLUSION

Based on the foregoing, IT IS ORDERED THAT: The decision of CNA denying benefits is **reversed**.